Michael Paul Senatore
Defenders of Wildlife
1130 17th Street, N.W.
Washington, D.C. 20036
(202) 772-3221
Fax: (202) 682-1331
msenatore@defenders.org

James Jay Tutchton
Defenders of Wildlife
6439 E. Maplewood Ave.
Centennial, CO 80111
(720) 301-3843
jtutchton@defenders.org

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DEFENDERS OF WILDLIFE<br>1130 17th Street N.W.<br>Washington, D.C. 20036-4604<br><br>     Plaintiff,<br><br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE<br>1849 C. Street N.W.<br>Washington, D.C. 20240<br><br>and<br><br>U.S. ARMY CORPS OF ENGINEERS<br>441 Street G Street, N.W.<br>Washington, D.C. 20226<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     But for the protection provided by the Endangered Species Act ("ESA"), the Perdido Key Beach Mouse (the "Mouse") would most likely be extinct. When the United States Fish and Wildlife Service ("FWS") first protected the Mouse under the ESA in 1985, it described the species as "one of the most critically endangered mammals in the United States." 50 Fed. Reg. 23,872, 23,873 (June 6, 1985). At that time scientists were able to locate slightly more than a dozen individual Mice.

2.     The principal underlying cause of the Mouse's catastrophic population decline is the destruction, adverse modification, and fragmentation of its habitat on Perdido Key, resulting from commercial and residential development and the corresponding increase in the numbers of domestic and feral house cats that prey on the Mouse.

3.     Since FWS protected the Perdido Key Beach Mouse under the ESA and began recovery efforts to save the species, its populations have recovered somewhat, typically numbering around 500 individuals. Importantly, *every known population of the Perdido Key Beach Mouse has been extirpated at least once* since 1985. The species has survived *only* because of translocations or re-introductions carried out under the ESA, which ensured that at least one Mouse population survived at all times. Today, however, as in 1985, few mammals are as close to extinction as the Perdido Key Beach Mouse.

4.     While the fate of a mouse may seem insignificant to some, its plight should serve as a warning, the proverbial canary in the coal mine, indicating that we are mismanaging its beach dune habitat on the Gulf Coast. As expressed by the Ninth Circuit:

> The decline of one of our fellow travelers on this planet is tragic in itself. It may also be a tocsin which tells us that we are doing something very wrong. Ideally, we would discover the decline and implement a remedy for it immediately.

*Oregon Natural Resources Council, Inc. v. Kantor*, 99 F.3d 334, 339 ( 9th Cir. 1996). The Perdido Key Beach Mouse is just such a tocsin telling us that we are "doing something very wrong" to the coastal dunes of Florida, an environmental treasure enjoyed by millions of annual human visitors.

5.      Defendants, however, have apparently forgotten the sad history of poorly planned and poorly sited development that led to the Mouse's endangered status. In approving a 70 acre development, known as the Lost Key Golf and Beach Club (the "Project"), which consists of multi-story condominiums, beach clubs, residences, hotel lodging and retail shops - totaling 1,900 resort residential units, 200 lodging units, and 20,000 square feet of commercial space – in the heart of the Mouse's designated critical habitat, Defendants have also forgotten just how close to extinction the Mouse remains and their legal duties to save and recover the species.

6.      Plaintiff contends that Defendants have issued permits allowing the Project to proceed in violation of the ESA, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). Plaintiff seeks relief declaring Defendants' approval of the Project illegal and an order setting aside Defendants' permits for the Project until they comply with these laws.

## JURISDICTION

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this lawsuit presents a federal question under the laws of the United States, including the ESA, 16 U.S.C. §§ 1531 *et seq.*, NEPA, 42 U.S.C. §§ 4321 *et seq.*, the APA, 5 U.S.C. §§ 701 *et seq.*, the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201 *et seq.*, and the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. This Court also has jurisdiction under 28 U.S.C. § 1346 (United States as defendant); and 28 U.S.C. § 1361 (mandamus).

8.      Plaintiff's request for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201(a) and 2202 (DJA) and 5 U.S.C. § 706(2)(A) (APA). An actual controversy, within the meaning of the DJA, exists between Plaintiff and Defendants. Plaintiff has exhausted all administrative remedies available to it as required by the APA.

## VENUE

9.      Venue properly rests in this judicial district pursuant to 28 U.S.C. § 1391(e) as both Defendants and Plaintiff reside in this judicial district.

## PARTIES

10.     Plaintiff, DEFENDERS OF WILDLIFE ("Defenders") is a national non-profit conservation organization headquartered in Washington, D.C. Defenders has more than one million members and supporters nationwide, including thousands in Florida and Alabama, the states in which the Mouse clings to existence. Defenders is a science-based advocacy organization focused on conserving and restoring native species and the habitat upon which they depend, and has been involved in such efforts since the organization's establishment in 1947. Defenders has a longstanding organizational interest in the preservation of endangered species such as the Perdido Key Beach Mouse. Its members participate in a wide range of aesthetic and recreational activities in the habitat of the Mouse, including beach walking and birdwatching , and attempt to view the Mouse and/or signs of its presence such as burrows or tracks in beach dunes. Defenders' membership includes adversely affected individuals who maintain homes on Perdido Key and who reside there for large portions of the year. The organization's members, officers, and staff pursue, and have concrete plans to continue pursuing, their aesthetic and recreational activities in the Mouse's habitat on Perdido Key. These interests of Defenders and its members are substantial and

are adversely affected by Defendants' failure to comply with the ESA, NEPA, and APA.

The requested relief will redress the injuries of Defenders and its members.

11.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("FWS")

is a federal agency within the U.S. Department of the Interior. The Secretary of the Interior

has delegated to FWS responsibility for administration and implementation of the ESA.

12.     Defendant UNITED STATES ARMY CORPS OF ENGINEERS (the

"Corps") is a federal agency within the U.S. Department of the Army. It is responsible for

issuing permits to fill wetlands pursuant to Section 404 of the Clean Water Act. In issuing

such permits, the Corps must comply with NEPA and the ESA.

## GOVERNING LAW

### I.      The Endangered Species Act

### A.      Purpose and Policy

13.     "As it was finally passed, the Endangered Species Act of 1973 represented

the most comprehensive legislation for the preservation of endangered species ever enacted

by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978). The purpose of the

ESA is to "provide a means whereby the ecosystems upon which endangered species and

threatened species depend may be conserved, [and] to provide a program for the

conservation of such endangered and threatened species …." 16 U.S.C. § 1531(b). Through

the ESA, Congress declared its policy "that all Federal departments and agencies shall seek

to conserve endangered and threatened species and shall utilize their authorities in

furtherance of the purposes of [the] Act. 16 U.S.C. § 1531(c).

14.     The ESA defines "conserve," "conserving," and "conservation" as "the use

of all methods and procedures which are necessary to bring any endangered species or

threatened species to the point at which the measures provided pursuant to [the ESA] are no

longer necessary." 16 U.S.C. § 1532(3). Accordingly, the goal of the ESA is not only to temporarily save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection.

15.     Importantly, however, the protective provisions of the ESA do nothing to conserve a species until that species is officially "listed" as either "threatened" or "endangered" under the terms of the Act. 16 U.S.C. § 1533.

**B.     Listing of Species**

16.     A species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is listed as "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

17.     Pursuant to its delegated authority from the Secretary of the Interior, FWS is required to list as either threatened or endangered any species facing extinction due to any one, or any combination of, the following five factors: (1) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting the species' continued existence. 16 U.S.C. §§ 1533(a)(1)(A)-(E).

18.     FWS' decision to list a species is limited solely to consideration of these five listing factors. In considering the five listing factors, FWS must employ "the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b).

**C.      Recovery Planning**

19.      The ESA provides many benefits to a listed species in order to encourage its recovery. One such important benefit is the requirement in Section 4(f) of the ESA that FWS "develop and implement [recovery] plans for the conservation and survival of [all listed] endangered species and threatened species … unless [it] finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1). In developing and implementing recovery plans FWS "shall, to the maximum extent practicable" prioritize the development of recovery plans for species "in conflict with construction or other development projects or other forms of economic activity." 16 U.S.C. § 1533(f)(1)(A). In each recovery plan, FWS shall, to the maximum extent practicable, include "a description of such site-specific management actions as may be necessary to achieve the plan's goal," "objective, measurable criteria which, when met, would result in a determination" that the species can be removed from the ESA list, and "estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal." 16 U.S.C. §§ 1533(f)(1)(B)(i), (ii) and (iii).

**D.      Designation of Critical Habitat**

20.      A second important benefit the ESA conveys to listed species in order to prompt their recovery is the "designation" of protected "critical habitat." *See* 16 U.S.C. § 1533(a)(3)(A)(i) (as amended in 1982)(FWS must "to the maximum extent prudent and determinable," designate critical habitat for all threatened and endangered species concurrently with their listing).

21.      The ESA defines "critical habitat" as:

(i) the specific areas within the geographic area occupied by the species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographic area occupied by the species at the time it is listed in accordance with the [ESA], upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

22.     As in listing decisions, in decisions to designate critical habitat, FWS must make its decision "on the basis of the best scientific data available." However, unlike listing decisions, in designating critical habitat FWS must also consider "the economic impact, and any other relevant impact of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). In light of these economic and other considerations, FWS "may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [it] determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." *Id.*

23.     The designation of critical habitat is one of the ESA's primary methods for conserving species. *See* 16 U.S.C. § 1533(a)(3). *See also Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434 (5th Cir. 2001) citing 16 U.S.C. § 1533(a)(3); *Bennett v. Spear*, 520 U.S. 154, 157-58 (1997)(objective of the ESA is to enable listed species not merely to survive, but to recover from their endangered status; to achieve this objective, Congress required the Secretary of the Interior to designate a 'critical habitat' for all listed species.).

**E.     Consultation with FWS**

24.     Critical habitat designation benefits listed species primarily through the ESA's consultation mechanism. ESA Section 7(a)(2) requires federal agencies to consult with FWS to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of that species' designated critical

habitat. 16 U.S.C. §1536(a)(2). Thus, regardless of whether critical habitat has been designated, the action agency must consult with FWS regarding whether the action may "jeopardize the continued existence" of any listed species. However, if critical habitat has been designated, the ESA imposes an additional consultation requirement concerning whether the action may result in the "destruction or adverse modification" of the species' designated critical habitat. *Id.*

25.     To comply with ESA Section 7(a)(2) an action agency, such as the Corps in the present case, generally must prepare a document called a "biological assessment." 16 U.S.C. § 1536(c)(1). The biological assessment process begins with a request from the action agency to FWS for information concerning whether any listed species or critical habitat is present in the project area. *Id.* After FWS provides this information, the action agency then determines, in the first instance, whether any listed species or critical habitat is likely to be affected by the proposed action. *Id.* The biological assessment then evaluates whether the species or critical habitat is likely to be affected by the proposed project. 50 C.F.R. § 402.12(a).

26.     If the proposed agency action *may affect* a listed species or critical habitat, the action agency must consult with FWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If the agency action *is likely to adversely affect* a species or critical habitat, the action agency must engage in "formal consultation" with FWS. 50 C.F.R. § 402.14(a). On the other hand, if the action agency determines that its action *may affect but is not likely to adversely affect* a species or critical habitat it may engage in "informal consultation" with FWS. 50 C.F.R. § 402.13(a); 50 C.F.R.. § 402.14(b)(1). If, as a result of informal consultation, FWS issues a written "concurrence" to the action agency that its proposed action is not likely to adversely affect a

listed species or critical habitat, the consultation process ends. 50 C.F.R. § 402.13(a); 50

C.F.R. § 402.14(b)(1).

27.     If FWS makes a determination that the agency action is likely to adversely

affect a species or its critical habitat, necessitating that the action agency and FWS engage in

formal consultation, FWS prepares a document known as a biological opinion to evaluate

whether the proposed action is likely to jeopardize the continued existence of a listed species

or destroy or adversely modify its critical habitat. 50 C.F.R. § 402.14. The biological opinion

must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2);

50 C.F.R. § 402.14(d). The biological opinion must include a summary of the information on

which it is based and must adequately detail and assess how the proposed action affects

listed species and their critical habitats. 50 C.F.R. § 402.14(h). The biological opinion must

also include an evaluation of the "cumulative effects on the listed species or critical habitat."

50 C.F.R. § 402.14(g)(3).

28.     During either informal or formal consultation, FWS may suggest to the

action agency modifications to the proposed project to avoid adverse effects to listed species

or critical habitat. 50 C.F.R. § 402.13(b) (informal consultation); 50 C.F.R. § 402.14(g)(5)

(formal consultation).

29.     In evaluating the potential for a proposed action to adversely modify critical

habitat, FWS must consider effects on either the survival *or* recovery of the listed species.

FWS's regulatory definition for "adverse modification" of critical habitat found in 50 C.F.R.

§ 402.02, which purports to limit the meaning of "adverse modification" to effects on critical

habitat impacting both the survival *and* recovery of a listed species, is facially inconsistent

with the ESA and has been stuck down by the Ninth Circuit. *Gifford Pinchot Task Force v. U.S.*

*Fish & Wildlife Serv.*, 378 F.3d 1059, 1069-70 (9th Cir. 2004), *amended by* 387 F.3d 968 (9th Cir. 2004).

30.    If FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species, or result in the destruction or adverse modification of designated critical habitat, the biological opinion must outline "reasonable and prudent alternatives" which FWS believes will avoid jeopardy or the destruction or adverse modification of designated critical habitat. 16 U.S.C. § 1536(b)(3)(A).

**F.    Prohibition of Take**

31.    Another significant protection the ESA provides to listed species is the prohibition against "take." The statute itself directly prohibits "take" of species that are listed as endangered. 16 U.S.C. § 1538. FWS has extended the "take" prohibition to threatened species by regulation. 50 C.F.R. § 17.31(a).

32.    "Take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct. 16 U.S.C. § 1532(19). The terms "harass" and "harm" are further defined in the ESA's implementing regulations. "Harass" means an intentional or negligent act or omission that creates the likelihood of injury to an animal by annoying it to such an extent as to significantly disrupt normal behavioral patterns that include, but are not limited to, breeding, feeding, or sheltering. 50 C.F.R. § 17.3. "Harm" means an act which actually kills or injures an animal. Such act may include significant habitat modifications or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering. *Id.*

33.    If a biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse

modification of the designated critical habitat of a species, but will result in the incidental

take of a protected species, the biological opinion must provide an "incidental take

statement," specifying the amount or extent of such incidental taking on the listed species,

and any "reasonable and prudent measures" that FWS considers necessary or appropriate to

minimize such impact, and setting forth the "terms and conditions" that the action agency

must  comply with  to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §

402.14(I).

34.     Without a biological opinion and an incidental take statement from FWS, an

action agency is not authorized to "take" any individuals of alisted species, nor may it

jeopardize the species' continued existence or destroy or adversely modify its designated

critical habitat.

## II.     The National Environmental Policy Act

35.     NEPA is our "basic national charter for protection of the environment." 40

C.F.R. § 1500.1(a).

36.     NEPA and its implementing regulations promulgated by the Council on

Environmental Quality ("CEQ") require federal agencies to prepare an environmental

impact statement ("EIS") for "every recommendation or report on proposals for legislation

and other major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.  CEQ regulations provide that

"'significantly' as used in NEPA requires considerations of both context and intensity." 40

C.F.R. § 1508.27. In considering the "intensity," or the "severity of impacts" of a project,

agencies must consider a number of factors, including unique characteristics of the project

site such as proximity to wetlands and ecologically critical areas; the degree to which the

impacts are highly controversial; the cumulatively significant nature of the impacts; and the

degree to which the action may adversely affect endangered species and their habitat. *See* 40 C.F.R. § 1508.27(b). Any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005).

37.     NEPA has "twin aims." First, it requires federal agencies "to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002), *quoting Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).

38.     The primary purpose of an EIS "is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1.

39.     "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken … Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

40.     NEPA requires federal agencies to analyze the direct, indirect, and cumulative impacts of proposed actions. 40 C.F.R. §§ 1508.7 & 1508.8. NEPA also requires federal agencies to take a "hard look" at the environmental effects of their proposed action, even after the proposal has received initial approval. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989).

41.     The fundamental purpose of NEPA is to engender more informed decisions by federal agencies and protect the environment as a result. Accordingly, NEPA requires an agency to consider a reasonable range of alternatives to the proposed action. The analysis of

the differing environmental impacts of these alternatives is considered the "heart" of the

NEPA analysis and thus an action agency must rigorously explore and objectively evaluate

all reasonable alternatives to its initially proposed course of action. 40 C.F.R. § 1502.14.

### III.   The Administrative Procedure Act

42.     The APA governs the scope of review of Plaintiff's ESA claims against FWS

and NEPA claims against the Corps. Because these statutes contain no internal standards of

review, section 706 of the APA, 5 U.S.C. § 706, also provides the standard of review for the

agency actions concerned. *Village of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984).

43.     The APA provides "[a] person suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

44.     The APA provides "the reviewing court shall … hold unlawful and set aside

agency actions, findings, and conclusions found to be … arbitrary, capricious, or an abuse of

discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or which have

been taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

### FACTUAL ALLEGATIONS

### I.   The Perdido Key Beach Mouse and Its Habitat

45.     The Perdido Key Beach Mouse, *Peromyscus polionotus trissyllepsis*, has a body

approximately three inches long, and a two-inch tail. Its fur is grayish to wood brown on top,

with a pale yellow hue and a faint central stripe. Its underside is white and its tail is white to

grayish brown. Historically, it inhabited nearly all of Perdido Key, and it is endemic to this

16-mile long barrier island. Perdido Key is found on the Gulf coast of Florida (Escambia

County) and Alabama (Baldwin County).

46.    Unique among field mice species, beach mice dig extensive and complex burrows, which they use to rest during the day and between nightly foraging ventures, to escape from predators, to have and care for their young, and to store food. The Mouse digs the entrance to its burrow on the sloping side of a dune at the base of a shrub or clump of grass. The Mouse then digs a nest chamber at the end of the level portion of the entrance tunnel, usually about 30 inches below the surface. The nest chamber is spherical and the nest itself is normally made of sea oat roots, stems, leaves and other plant material. The Mouse also digs an escape tunnel from the nest chamber to about an inch below the surface. The Mouse carefully selects burrow sites based on factors such as dune slope, soil compaction, vegetative cover, and, importantly, height above sea level. A shortage of good burrow sites has negative impacts on the Mouse's population.

47.    The Mouse is nocturnal and forages for food throughout the shoreline dune system. It feeds primarily upon seeds and fruits, but occasionally preys on insects. The Mouse eats whatever seeds or fruits are seasonally available. The frontal dune system, that closest to the ocean, normally contains more plant species that produce high quality Mouse food. However, these plants are primarily grasses and annuals that produce high quantities of small seeds in a short period of time. During other seasons, the Mouse relies on the landward "scrub dunes" whose plants produce larger seeds and fruits over a longer period of time.

48.    The Mouse can reproduce throughout the year and reaches sexual maturity at about 55 days of age. The peak breeding season is during fall and winter, then breeding declines in the spring and falls to low levels during the summer. The Mouse is monogamous and appears to pair for life, though paired males may occasionally sire liters with unpaired females. The average liter size is four pups.

49.     The Mouse's average life span in the wild is about nine months. In captivity, the Mouse may live three years or more.

50.     The Mouse's coastal dune habitat consists of three categories: (1) primary dunes, closest to the sea and characterized by sea oats and other grasses; (2) secondary dunes, slightly landward from the primary dunes, which contain additional plant species such as woody goldenrod and false rosemary; and (3) scrub dunes that occur further inland and are characterized by scrub oaks and yaupon holly. The transition from scrub dunes to maritime forest, characterized by large trees (pines and oaks), thick leaf litter and a dense understory, usually marks the boundary or landward extent of suitable Mouse habitat. Contrary to the earlier belief that the Mouse preferred the primary and secondary dunes, more recent research has shown that the scrub dunes provide invaluable habitat for the Mouse and are vital to its survival. This is because the scrub dunes provide a more stable level of food resources in comparison with the "boom and bust" cycle of the primary and secondary dunes and because scrub dunes also provide relatively high-elevation burrow sites and a refuge during storm events. Because Mouse populations in scrub dunes have a better chance of surviving storms, these populations provide a source that allows the Mouse to recolonize the primary and secondary dunes (that are frequently overwashed and denuded of vegetation during storms) once the frontal dunes recover.

51.     The Mouse's beach front habitat is also highly desired by humans. Beach-front development along the Gulf Coast of Florida began in the 1950s and continues to this day. Along with the rest of northwest Florida, Perdido Key has experienced increased residential and resort development. Residential and commercial development destroys Mouse habitat in two primary ways: first, by converting beach dunes to structures and parking lots; and second, by fragmenting the Mouse's habitat into small isolated patches

separated by barriers to the Mouse's movement. Additionally, residential development leads to an influx of both native predators, attracted by trash and increased food sources, and non-native predators, such as domestic and feral cats. Residential development also brings with it an influx of house mice, which then compete with beach mice for food. A development induced invasion of predators and house mice likely caused the extinction of another Florida beach mouse species, the Pallid Beach Mouse, which was closely related to the Perdido Key Beach Mouse.

## II.    The ESA Listing of the Perdido Key Beach Mouse and Efforts to Save the Species

52.    But for the protection provided by the ESA, the Perdido Key Beach Mouse most likely would be extinct. In 1979, prior to Hurricane Frederick, scientists estimated that only 78 Perdido Key Beach Mice survived: 52 at the Gulf Islands National Seashore on the eastern end of Perdido Key and 28 at Gulf State Park on the western end. After Hurricane Frederick, scientists caught only a single Mouse at Gulf State Park. Subsequently, scientists caught 13 individual Mice at Gulf State Park, but none at the Gulf Islands National Seashore. Consequently, when FWS listed the Mouse under the ESA in 1985, it described the species as "one of the most critically endangered mammals in the United States." 50 Fed. Reg. 23,872, 23,873 (June 6, 1985).

53.    The underlying cause of the Mouse's catastrophic population decline, however, was not hurricanes, but the destruction, adverse modification, and fragmentation of its habitat on Perdido Key resulting from commercial and residential development and the corresponding increase in the numbers of domestic and feral house cats that preyed on the Mouse.

54.    Since FWS protected the Mouse under the ESA and began recovery efforts to save the species, its populations have recovered somewhat, typically ranging around 500

individuals. However, *every known population of the Perdido Key Beach Mouse has been extirpated at least once* since 1985, and the species has survived *only* because of translocations or re-introductions carried out under the ESA, which enabled at least one Mouse population to survive at all times.

55.     Shortly after FWS listed the Mouse under the ESA in 1985, the only known population of the Mouse was fewer than 30 individuals at Gulf State Park. FWS trapped and translocated some of these individuals to the Gulf Islands National Seashore beginning in 1986. FWS then used Mice from the re-established population at the Gulf Islands National Seashore to re-establish a population in Perdido Key State Park in 2000. However, by 2000, the originally surviving population at Gulf State Park had died out. As a result of these recovery efforts, just prior to Hurricane Ivan in 2004, the Perdido Key-wide population of the Mouse had rebounded to between 500 and 800 individuals.

56.     After Hurricane Ivan in 2004 and the active 2005 hurricane season (Hurricanes Cindy, Dennis, Katrina, and tropical storm Arlene) the Mouse's population was uncertain. Hurricane Ivan had particularly bad effects on the Mouse's population as high water marks on Perdido Key reached 10 to 15 feet above sea level during this storm. Hurricane Ivan affected the entire historic range of the Mouse on Perdido Key in the following ways: (1) tidal surge and wave action overwashed habitat leaving a flat sand surface denuded of vegetation; (2) sand deposition completely or partially covered vegetation; (3) blowouts occurred between the Gulf and bay/lagoon leaving a patchy landscape of bare sand, dune, and scrub habitat; (4) the frontal portion of the primary dune habitat was sheared *but landward areas were relatively unaffected*; (5) vegetation was killed by salt spray; and (6) islands were breached entirely and channels from the Gulf to bay/lagoon were created. The experience of Hurricane Ivan illustrated the vital importance of higher elevation, landward

scrub dunes to the Mouse's survival as these habitats were virtually the only habitats that survived the storm relatively unaffected.

57.     Because of the storms discussed above and their dramatic negative effects on the Mouse's population and its habitat, as a hedge against possible extinction, the Florida Wildlife Commission trapped 8 Mice at Perdido Key State Park and placed them in captivity. These Mice were entered into a captive breeding program at three locations in Florida: Brevard Zoo, Palm Beach Zoo, and the Santa Fe Teaching College. Offspring from these Mice are still maintained in captivity at these three locations.

58.     After the storms of 2004 and 2005, in October 2005, scientists were able to locate fewer than 30 individual Mice at Perdido Key State Park and the Gulf Islands National Seashore. But for the existence of the landward scrub dunes that were relatively unaffected by the 2004 and 2005 storms, these Mice may not have survived. However, after the storms, Mice that survived in the scrub dunes began to recolonize primary and secondary frontal dunes as these areas recovered. Tracking data from June 2006 indicated that about 25% of the available Mouse habitat at Perdido Key State Park and 32% of the available habitat at the Gulf Islands National Seashore was occupied by Mice. Trapping at both these locations in March 2007 was cancelled after only one night because a single Mouse was captured and unfortunately killed, and there were very limited sightings of Mouse burrows or tracks. Trapping conducted in April 2008 resulted in the capture of 35 Mice at the Gulf Islands National Seashore, but no Mice at Perdido Key State Park. However, tracking data from 2009 and trapping in 2010 indicated that Mice continued to survive at both the Gulf Islands National Seashore and Perdido Key State Park. The number of Mice in these locations remains unknown, but is likely below that which existed prior to the 2004 and 2005 storm season.

59.     In 2010, 48 Mice from the captive population in the Brevard and Palm Beach Zoos were released in Gulf State Park to establish a third known population. All 48 Mice were fitted with radio transmitters. Within a few days of the release, however, most of the 48 Mice were killed by a pair of red foxes living near the Carib condominiums. U.S. Department of Agriculture employees subsequently killed the red fox pair and their five pups, but by that time only 13 of the released Mice survived. Nonetheless, the release appears to have been a success as trapping conducted later in 2010 found 51 Mice, including 8 survivors from the original release.

60.     Accordingly, the Mouse now occupies all three public land areas in its historic range, Perdido Key State Park, Gulf State Park, and the Gulf Islands National Seashore, for the first time since the species was listed in 1985. However, the number of Mice in these three "core" populations remains largely unknown and their viability is uncertain. Each of these populations has died out in the past and was only re-established through human translocation efforts. Because the three core public land populations are subject to local extirpation, it is important that they be connected via protected corridors through which Mice can move to provide genetic exchange and recolonization if a population is extirpated. The three public land core populations are thus linked by the designation of critical habitat on intervening private lands, as discussed below, and FWS considers these private land areas essential to the conservation of the Mouse. However, despite the ESA listing of the Mouse in 1985 and the designation of critical habitat, since 1985, the amount of available and suitable Mouse habitat has been reduced and fragmentation has increased due to development on Perdido Key.

**III.**    **Critical Habitat Designation for the Perdido Key Beach Mouse**

61.    FWS first designated critical habitat for the Mouse in 1985. However, as new scientific research established that the Mouse uses interior or landward scrub dune habitat on a permanent basis and that this habitat serves an invaluable role in the persistence of Mouse population after storm events, FWS revised its critical habitat designation for the Mouse in 2006 to include an additional 135 acres of scrub dune habitat.

62.    FWS has currently designated as critical habitat for the Mouse those lands determined to be *essential* to the conservation of the species, meaning that without these areas the Mouse is not expected to survive or recover. FWS has determined which areas to designate as Mouse critical habitat based on the existence of one or more of five "primary constituent elements" ("PCEs") that FWS has determined are essential to sustain the life history functions of the Mouse. The five PCEs are: (1) a contiguous mosaic of primary, secondary, and scrub vegetation and dune structure, with a balanced level of competition and predation and few or no competitive or predaceous nonnative species present, that collectively provide foraging opportunities, cover, and burrow sites; (2) primary and secondary dunes, generally dominated by sea oats, that despite occasional temporary impacts and reconfiguration from tropical storms and hurricanes, provide abundant food resources, burrow sites, and protection from predators; (3) scrub dunes, generally dominated by scrub oaks, that provide food resources and burrow sites, and provide elevated refugia during and after intense flooding due to rainfall and/or hurricane induced storm surge; (4) functional, unobstructed habitat connections that facilitate genetic exchange, dispersal, natural exploratory movements, and recolonization of locally extirpated areas; and (5) a natural light regime within the coastal dune ecosystem, compatible with the nocturnal activity of beach mice, necessary for normal behavior, growth and viability of all life stages.

63.     FWS has divided the land it has designated as the Mouse's critical habitat into five critical habitat units. Moving from west to east along Perdido Key, these five critical habitat units are: the Gulf State Park Unit; the West Perdido Key Unit; the Perdido Key State Park Unit; the Gulf Beach Unit; and the Gulf Islands National Seashore Unit. As discussed above, the three core Mouse populations on the public land units, Gulf State Park, Perdido Key State Park, and the Gulf Islands National Seashore, are linked by two intervening private land units, the West Perdido Key Unit and the Gulf Beach Unit. FWS has determined that each of the five Units is essential to the conservation of the species and that all likely currently contain at least some Mice. Connectivity among all the Units is essential to allow the total designated critical habitat to provide for the survival or recovery of the Mouse. In total, the five units contain 1,300 acres of designated critical habitat composed of 638 acres of federal land, 353 acres of state land, and 309 acres of private or local land.

64.     Unit 1, the Gulf State Park Unit, consists of 115 acres of state land in southern Baldwin County, Alabama. The Mouse was known to inhabit this Unit during surveys conducted in 1979 and 1982, and by 1986, this Unit contained the only known population of the Mouse. Thus, this Unit served as the donor site from which scientists captured Mice that were relocated to the Gulf Islands National Seashore critical habitat unit in 1986. That relocation effort saved the Mouse from extinction as by 1998 the Mouse population in the Gulf State Park Unit was extirpated due to tropical storms and predators. However, the reintroduction of captive bred Mice to this critical habitat unit in 2010 discussed above appears to have been successful, and this Unit is currently considered occupied. The Gulf State Park Unit was expanded during the 2006 revision of the critical habitat designation to include interior scrub dune habitat, in addition to the previously

designated primary and secondary dune habitat, because FWS had learned this higher elevation habitat was essential to the long-term persistence of Mouse populations. The Gulf State Park Unit provides PCEs 2, 3, 4, and 5 and is essential to the conservation of the Mouse.

65.     Unit 2, the West Perdido Key Unit, consists of 114 acres of private or local land in Escambia County, Florida and 33 acres of private or local land in Baldwin County, Alabama (147 acres in total). While no trapping has been conducted on these private lands to conclusively determine the presence of the Mouse, signs of Mouse presence -- burrows and tracks -- were confirmed in 2005. Accordingly, FWS considers this Unit currently occupied by the Mouse. This Unit is contiguous with two other occupied Units (Gulf State Park, Unit 1 and Perdido Key State Park, Unit 3) and thus provides essential connectivity between these core populations, enabling habitat expansion, natural movements and recolonization. Accordingly, FWS considers critical habitat Unit 2 essential to the conservation of the species.  The West Perdido Key Unit contains primary, secondary, and scrub dune habitat and provides PCEs 2, 3, and 4.

66.     Unit 3, the Perdido Key State Park Unit, consists of 238 acres of state land in Escambia County, Florida. FWS considers this Unit occupied by the Mouse, containing a core population, and essential to the Mouse's survival and recovery. The Unit contains primary and secondary dunes and was expanded to include scrub dunes during the 2006 critical habitat re-designation. It provides PCEs 2, 3, 4, and 5. This Unit suffered from the effects of storm overwash and inundation by storm surge several times during the 2004 and 2005 storm seasons.

67.     Unit 4, the Gulf Beach Unit, consists of 162 acres of private land in Escambia County, Florida. It contains primary, secondary, and scrub dune habitat. A Mouse

was trapped in this Unit in 2004 during a very limited trapping effort. However, no additional data to determine Mouse presence or absence has been collected within this Unit since 2004. The Gulf Beach Unit currently provides essential connectivity between two core Mouse populations (Perdido Key State Park, Unit 3 and the Gulf Islands National Seashore, Unit 5). FWS has determined this Unit provides PCEs 2, 3, and 4 and is essential to the conservation of the Mouse. The Gulf Beach Unit includes high-elevation scrub habitat and serves as a refuge during storm events and as an important repopulation source if storms extirpate or greatly reduce other Mouse populations as has occurred in the past. Habitat fragmentation and other threats specific to this Unit are mainly due to development. Threats to Gulf Beach Unit that may require special management consideration include habitat fragmentation and habitat loss, artificial lighting, presence of feral cats as well as other predators at unnatural levels, excessive foot traffic and soil compaction, and damage to dune vegetation and structure.

68.     Unit 5, the Gulf Islands National Seashore Unit, consists of 638 acres of federal land in Escambia County, Florida. It consists mainly of primary and secondary dune habitat and is short on higher elevation scrub dune habitat because of its topography. The Mouse was known to inhabit this Unit in 1979. However, in 1979, Hurricane Frederic affected this Unit and apparently wiped out the Mouse population as no Mice were captured during surveys in 1982 and 1986. In 1986, Mice captured from Gulf State Park were released in this Unit as part of FWS's recovery efforts. This reintroduction was successful and saved the Mouse from extinction as the Gulf State Park population subsequently died out by 1998. In 2000 and 2001, Mice captured from this Unit served as donors to re-establish the Mouse at Perdido Key State Park. Today, the Gulf Islands National Seashore Unit is considered to contain a core Mouse population. Unit 5 is the only critical habitat unit which contains all

five PCEs and is considered essential to the conservation of the species. Like Unit 3, this Unit was severely damaged by storm overwash and inundation by storm surge during the 2004 and 2005 storm seasons.

## IV.    Recovery Planning for the Perdido Key Beach Mouse

69.    FWS completed a Recovery Plan for the Mouse in 1987. However, this 1987 Recovery Plan is not up-to-date with regard to the species' status and threats. In particular, the 1987 Recovery Plan was prepared before FWS recognized the importance of higher elevation scrub dune habitat to the Mouse's long-term persistence and revised its critical habitat designation in 2006. Over five years ago, in 2007, FWS acknowledged that the 1987 Recovery Plan should be updated to reflect the revised critical habitat designation, new knowledge about the importance of higher elevation scrub dune habitat, and new knowledge of the Mouse's status and threats to its survival or recovery, but the agency has, thus far, failed to revise its Recovery Plan. Since the Recovery Plan was completed in 1987, every known population of the Mouse has been extirpated at some point, though through translocation efforts at least one population has always persisted. Additionally, a key recovery criterion in the 1987 Plan, that a minimum of 50% of the Mouse's designated critical habitat is protected and occupied by Mice, has never been met for either the original or the revised critical habitat designation. Accordingly, despite over 25 years of legal protection and recovery efforts by FWS, the Mouse remains far from recovery.

## V.    Defendants' Approval of the Project and Its Impacts on the Mouse

70.    A private company, WCI Communities, LLC ("WCI"), wants to build a 70 acre development, known as the Lost Key Golf and Beach Club (the "Project") on Perdido Key. To build the Project, WCI will fill in wetlands. In order to legally fill these wetlands, WCI must obtain what is known as a "section 404 permit," issued pursuant to the Clean

Water Act, from the Corps. The issuance of the section 404 permit by the Corps is a federal

action triggering the Corps' duty to comply with both the ESA and NEPA.

### A.      Defendants' Efforts to Comply with the ESA

71.      The Corps determined that the Project may adversely affect the Mouse.

Accordingly, it requested formal consultation pursuant to ESA Section 7(a)(2) with FWS on

the Project's impacts to the Mouse. After completing formal consultation, FWS issued a

Biological Opinion to the Corps on August 13, 2012. FWS determined the Project would

not jeopardize the continued existence of the Mouse and would not destroy or adversely

modify the Mouse's designated critical habitat. FWS's conclusion does not withstand

scrutiny.

72.      The Project, which consists of multi-story condominiums, beach clubs,

residences, hotel lodging and retail shops – totaling 1,900 resort residential units, 200 lodging

units, and 20,000 square feet of commercial space – is proposed to be constructed in the

heart of the Mouse Critical Habitat Unit 4, the Gulf Beach Unit. In total, the Gulf Beach

Unit contains 162 acres of designated Mouse critical habitat. The 70-acre Project site

contains 59.4 acres of this designated critical habitat. Of these 59.4 acres, the Project will

*permanently destroy* 26.1 acres and *temporarily impact* an additional 7.4 acres that will be restored.

FWS has indicated that, in reaching its conclusion in its Biological Opinion that the Project

will not destroy or adversely modify designated critical habitat,  it did not rely on its

regulatory definition of destruction or adverse modification of critical habitat, 50 C.F.R. §

402.02, which is facially inconsistent with the ESA and was struck down by the Ninth

Circuit. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069-70 (9th Cir.

2004), *amended by* 387 F.3d 968 (9th Cir. 2004). Rather, FWS stated that it relied upon the

statutory provisions of the ESA itself in reaching its conclusion. However, FWS's conclusion

that, in allowing the permanent destruction of 26.1 acres of designated critical habitat and the temporary adverse modification of 7.4 acres of critical habitat, it has not run afoul of the clear statutory language requiring it to "insure that any action authorized, funded, or carried out by [the Corps] … is not likely to … result in the destruction or adverse modification" of the Mouse's designated critical habitat, is impossible to reconcile with the best available scientific evidence before it. *See* 16 U.S.C. §1536(a)(2).

73.     FWS supports its flawed conclusion that the admitted permanent destruction of 26.1 acres of designated critical habitat does not represent a prohibited destruction  or adverse modification of critical habitat, in part, by reasoning that, at the end of the Project, the remaining 33.3 acres of designated critical habitat to be affected will be placed into a conservation easement. Thus, FWS asserts that, because the Project will destroy only 44% of the critical habitat in its footprint that on balance the Project does not adversely modify or destroy designated critical habitat. In other words, the Service reasons that 26.1 acres out of 59.4 acres will be destroyed, representing 44% of the affected critical habitat, while 33.3 acres will be preserved, representing 56% of the affected critical habitat. However, the ESA's plain statutory language, clearly prohibiting the destruction or adverse modification of designated critical habitat, does not permit the FWS to engage in this type of calculation.

74.     FWS relies on the fact that the 26.1 acres of permanent critical habitat destruction represents only 16% of the total 162 acres of critical habitat in the Gulf Beach Critical Habitat Unit, and only 2% of the 1,300 acres of total Mouse critical habitat in all five critical habitat units. However, FWS overlooks a vital consideration in reaching its conclusion that this relatively small percentage loss of critical habitat is unimportant.

75.     FWS has already found that *all* designated critical habitat is essential to the survival or recovery of the Mouse. Accordingly, FWS cannot now assert that some

designated critical habitat is not important to the Mouse's survival or recovery. FWS admits

that the Mouse currently occupies the Gulf Beach Critical Habitat Unit. The Gulf Beach

Unit also provides essential connectivity between two core Mouse populations, Perdido Key

State Park and the Gulf Islands National Seashore, and between frontal and scrub dune

habitat, thus providing habitat for natural movements, refuge from storm surge, and Mouse

population persistence. Actions that may prevent or temporarily impede these movements in

the Gulf Beach Unit may also prohibit these natural behaviors and may ultimately determine

the ability of the Mouse to survive in the wild. In fact, if FWS is going to consider some

designated critical habitat as more important than other designated critical habitat, the Gulf

Beach Unit is among the Mouse's *most critical* critical habitat. Because the Gulf Beach Critical

Habitat Unit contains the widest portion of Perdido Key and also some of the highest

elevation scrub dunes (those 9 feet above mean sea level), it is particularly important critical

habitat because it is less likely to be impacted by tropical storm surges. Mice in the Gulf

Beach Unit have a better chance of surviving tropical storms. Thus, it is believed that Mice

in this Unit have historically provided for the recolonization of Mouse populations in the

Gulf Islands National Seashore and Perdido Key State Park and that Mice from this Unit

may facilitate similar recolonization in the future. In short, because the Gulf Beach Unit

contains intact high elevation scrub dunes and is located on the widest portion of Perdido

Key, it is less vulnerable to storm surge and is the most important Mouse habitat remaining

on private lands.

76.     Accordingly, FWS's reliance on the small percentage of total Mouse critical

habitat, or the 16% figure of critical habitat in the Gulf Beach Unit, to be destroyed by the

Project is misplaced. The more important analysis is what percentage of the most important

habitat, the high elevation scrub dunes, is being lost. Perdido Key has relatively few high

elevation dunes to provide refugia for Mouse during and in the aftermath of storms. Both the adjacent core Mouse populations in the Gulf Island National Seashore and Perdido Key State Park suffer from a shortage of high elevation scrub dune habitat and have been extirpated after past storm events that overwashed these areas. In contrast, the northern portion of Project site currently contains nearly 20 acres of higher elevation Mouse habitat. Of these 20 acres, the Project will destroy 7.4 acres while 12.6 acres will be preserved. Thus, 37% of the Mouse's most important critical habitat will be destroyed by the Project (7.4/20 acres). This is a dramatically more important number than the 16% of the total acres of critical habitat in the Gulf Beach Unit to be destroyed by the Project or the 2% of the total acres of Mouse critical habitat overall. FWS has failed to adequately analyze the impacts of the loss of this 37% of the very best Mouse critical habitat on the survival and recovery of the Mouse.

77.     FWS has also failed to adequately analyze how the placement of multi-story condominiums, beach clubs, residences, hotel lodging and retail shops - totaling 1,900 resort residential units, 200 lodging units, and 20,000 square feet of commercial space – in the middle of the Gulf Beach Critical Habitat Unit will allow this critical habitat unit to continue serving as a vital connection between the core Mouse populations in the Gulf Islands National Seashore and Perdido Key State Park Critical Habitat Units. Moreover, FWS has also failed to adequately analyze how the placement of this large development in Mouse critical habitat will allow the Mouse to move about the parcel between the primary and secondary dunes and the scrub dunes. Access to both types of dune systems is vital to the Mouse. Thus, even though examples of both dune systems may be preserved on the Project site, if Mice cannot move seasonally to take advantage of food resources or to seek refuge during storm events between the two systems, the Mouse cannot survive on the Project site.

FWS has failed to address the ability of Mice to move about the Project site once it is developed. Additionally, FWS has failed to adequately analyze or discuss how the presence of such a large project might induce development on the other adjacent private lands in the Gulf Beach Critical Habitat Unit and thus create cumulative impacts harming the ability of this Critical Habitat Unit to serve as a corridor for Mouse movement.

78.     Additionally, though FWS relies on the presence of designated Mouse critical habitat elsewhere to excuse the destruction of the Mouse critical habitat in the Gulf Beach Unit, FWS does not address the potential for the Project's 1,900 resort residential units, 200 lodging units, and 20,000 square feet of commercial space to increase visitation to Perdido Key and thus increase the impacts on other Mouse Critical Habitat Units as resort visitors and residents may certainly be expected to recreate in the Gulf Islands National Seashore, Perdido Key State Park, and Gulf State Park – the three public land critical habitat units containing the three core Mouse populations. Visitor use results in the trampling of beach dune vegetation, soil compaction, the presence of dogs, and increased trash that attracts and supports unnaturally high populations of native predators. All of these known threats to the Mouse are likely to be increased by the Project throughout the Mouse's designated critical habitat. Thus, even though the Project is located only in the Gulf Beach Critical Habitat Unit, it also will directly and indirectly result in additional impacts to the three public land critical habitat units that FWS has failed to adequately analyze.

79.     As discussed above, one of the additional mechanisms by which residential development harms the Mouse is by bringing domestic house cats into Mouse habitat. Residential development also generates trash and other food sources that allow unnaturally high populations of native predators to persist in Mouse habitat, further harming the Mouse. FWS discounts this potential impact of the Project because WCI is required to prohibit cats

and free ranging dogs on the Project site and will be responsible for contacting County animal control to handle predator issues. The prohibition of cats is implemented via deed restrictions. However, FWS does not analyze the ability of WCI to actually enforce deed restrictions prohibiting cats and rules restricting free ranging dogs or the likelihood of WCI's success in such endeavors. Furthermore, FWS does not analyze the likelihood that County animal control agents will actually handle predator issues. FWS's reliance on these methods to actually reduce the Project's impacts to the Mouse inappropriately engages in a good deal of speculation. FWS must analyze the likelihood of the success of these measures in actually preventing the Mouse's designated critical habitat from being overrun by domestic and feral cats. Indeed, the deed restrictions might increase feral cat populations as residential owners may release prohibited cats to the wild in an effort to deny ownership.

80.     FWS also relies on the payment of funds by WCI to the Conservation Fund held by Escambia County to reduce the Project's impacts to the Mouse. However, these funds cannot be used to purchase Mouse habitat equal or similar to the size and ecological importance of the habitat on the Project site. Because the most pressing threat to the Mouse's survival and recovery is habitat loss, it is difficult to understand how the payment of money that cannot be used to replace vital habitat can offset the destruction of that designated critical habitat. FWS arbitrarily concludes that the mere payment of money, to be spent on unspecified projects but that cannot be used to purchase replacement habitat, negates or ameliorates the destruction of designated critical habitat.

81.     FWS expects the Project to result in the incidental take of individual Mice. Accordingly, its Biological Opinion contains an incidental take statement legalizing this take. FWS anticipates that take will result from harm to the Mouse on the 26.1 acres of critical habitat to be destroyed, harm to the Mouse on the areas that will be temporarily impacted

and restored, and harassment of the Mouse through behavior modification on the rest of the Project site due to construction resulting in altered interactions with other individual Mice, reduction of foraging or dispersal activities, reduction of potential population expansion, and increased predation. An incidental take statement is required to specify the amount or extent of such incidental taking on the listed species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I). However, as discussed above, though FWS concludes the Mouse occupies the Project site, it has no idea how many Mice actually live there. FWS's incidental take statement thus effectively allows the take of an unlimited number of Mice – i.e. all the Mice on the Project site. Because the actual number of Mice on the Project site is unknown, the number of Mice to be taken may be one or one hundred. FWS has entirely failed to specify the amount or extent of such take on the Mouse and its effects on the survival of the species. It is quite possible the Project site contains a large Mouse population. A limited trapping effort in 2004 captured one Mouse in the Gulf Beach Critical Habitat Unit, but no survey efforts have been conducted since that time. The critical habitat unit is a corridor between core Mouse populations and contains important scrub dune habitat that allows Mice populations to seek refuge during storms. Both migrating and resident Mice are likely to be found in the area. Yet FWS has simply approved the take of an unlimited number of Mice in violation of the ESA.

### B. The Corps' Efforts to Comply with NEPA

82. To comply with NEPA, the Corps prepared an Environmental Assessment ("EA"). The Corps' EA is little more than a "check the box" form. The Corps' form EA contains no actual analysis of reasonable alternatives to the proposed Project. Rather, the Corps' EA simply states that other alternatives considered, which are neither described nor

detailed, would have had greater impacts to the Mouse. The Corps' analysis of the "no action" alternative simply rejects it because it would not allow the Project to proceed.

83.     With respect to the Project's impacts to the Mouse, the Corps' EA acknowledges that dune/scrub habitat on the Project site may contain the Mouse, but the Corps made no effort to determine the number of Mice present or even to verify their presence or absence. The Corps' EA simply states the Project will not jeopardize the continued existence of the Mouse or affect its critical habitat. The latter statement is certainly wrong as FWS has concluded the Project will destroy 26.1 acres of designated Mouse critical habitat. More importantly, the Corps distributed its EA for public comment in June 2011, prior to FWS's completion of the Biological Opinion and thus the public reading or attempting to comment on the EA did not have the benefit of FWS's evaluation of the Project's actual impacts to the Mouse or its critical habitat.

84.     In the end, the Corps EA relies entirely on FWS's conclusion that the Project will neither jeopardize the continued existence of the Mouse, nor destroy or adversely modify its designated critical habitat, to sustain its own conclusion that the Project will not have significant effects under NEPA. This conclusion is inappropriate as it is quite possible for a Project to have significant effects under NEPA that fall short of jeopardizing the continued existence of an endangered species or destroying or adversely modifying its critical habitat. Indeed, the Corps' EA neither discusses or discloses that the Project it is approving will result in the permanent destruction of 26.1 acres of designated Mouse critical habitat, nor discloses the Project will take individual Mice – both of which are significant effects under NEPA.

## FIRST CLAIM FOR RELIEF
### Violation of NEPA by the Corps
### (Failure to Take "Hard Look" at Impacts)

85.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 84 of this Complaint herein by reference.

86.     The Corps' EA for the Project fails to take a hard look at the direct and indirect impacts of the proposed action on the Mouse and its designated critical habitat. In particular, the Corps failed to analyze the impact of the Project's admitted destruction of 26.1 acres of designated Mouse critical habitat, its take of an unknown number of individual Mice, its potential to further fragment Mouse habitat, its potential to introduce or increase the numbers of domestic or feral cats or other predators in Mouse habitat, or its potential to prevent Mouse movement among critical habitat units or within the Gulf Beach Unit between primary, secondary, and scrub dunes. Because the Corps failed to take the required "hard look" at these impacts, it arbitrarily concluded that there would be no significant environmental impacts.

87.     Accordingly, for the reasons set forth above, the Corps' actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA or the procedures required by law in violation of APA Sections 706(2)(A) & (D). 5 U.S.C. §§ 706(2)(A), (D). Plaintiff is entitled to recover costs, disbursements, and attorney's fees pursuant to EAJA, 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF
### Violation of NEPA by the Corps
### (Failure to Analyze Cumulative Impacts)

88.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 84 of this Complaint herein by reference.

89.     The Corps' EA for the Project fails to analyze cumulative impacts of the proposed action on the Mouse and its designated critical habitat.

90.     NEPA requires federal agencies to analyze the cumulative effects of their actions, which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.25(a). The Corps' Environmental Assessment for the Project violates NEPA because it fails to account for the cumulative effect of the Project together with other past, present, and reasonably foreseeable similar development Projects and other ground-disturbing activities. Indeed, it contains no such analysis.

91.     Accordingly, for the reasons set forth above, the Corps' actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA or the procedures required by law in violation of APA Sections 706(2)(A) & (D). 5 U.S.C. §§ 706(2)(A), (D). Plaintiff is entitled to recover costs, disbursements, and attorney's fees pursuant to EAJA, 28 U.S.C. § 2412.

### THIRD CLAIM FOR RELIEF
### Violation of NEPA by the Corps
### (Failure to Prepare Environmental Impact Statement)

92.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 84 of this Complaint herein by reference.

93.     NEPA requires a full EIS rather than an EA if the project may significantly impact the environment.

94.     The Corps prepared only an EA for the Project.

95.     One of the factors that must be considered when determining whether a project may significantly impact the environment is "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined

to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(9). The

Corps' reliance on FWS's conclusion that the Project will not jeopardize the continued

existence of the Mouse or destroy or adversely modify its designated critical habitat is not an

analysis of the "degree" to which the action may adversely affect the Mouse or its critical

habitat or the degree to which these adverse effects rise to the level of significance.

96.     The Project may significantly impact the environment.

97.     Accordingly, for the reasons set forth above, the Corps' actions and inactions

are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA

or the procedures required by law in violation of APA Sections 706(2)(A) & (D). 5 U.S.C. §§

706(2)(A), (D). Plaintiff is entitled to recover costs, disbursements, and attorney's fees

pursuant to EAJA, 28 U.S.C. § 2412.

## FOURTH CLAIM FOR RELIEF
### Violation of NEPA by the Corps
### (Failure to Develop a Reasonable Range of Alternatives)

98.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through

84 of this Complaint herein by reference.

99.     NEPA requires the Corps to consider a reasonable range of alternatives to

the proposed action. The alternatives analysis is the "heart" of the agency's environmental

analysis and the Corps must rigorously explore and objectively evaluate all reasonable

alternatives. 40 C.F.R. § 1502.14.

100.    The Corps analyzed only one action alternative, the Project as proposed. The

Corps' analysis of the "no action" alternative consists only of a statement that it would not

allow the Project to proceed and was therefore presumably rejected. The Corps indicates

that it also rejected other alternatives, which are neither described nor analyzed in its EA,

because they would have had greater impacts on the Mouse.

101.     The Corps failed to adequately consider an alternative that would have avoided impacts to the Mouse's designated critical habitat or reduced impacts on the Mouse's designated critical habitat.

102.     The Corps prepared an unreasonably narrow purpose and need statement, stating only that the Project's purpose and need was a multi-use development, which led to the unduly restricted range of alternatives.

103.     Therefore, the decision to proceed with the Project should be set aside, and the Project enjoined until the Corps prepares a NEPA document that includes the evaluation of a full range of reasonable alternatives.

104.     Accordingly, for the reasons set forth above, the Corps' actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA or the procedures required by law in violation of APA Sections 706(2)(A) & (D). 5 U.S.C. §§ 706(2)(A), (D). Plaintiff is entitled to recover costs, disbursements, and attorney's fees pursuant to EAJA, 28 U.S.C. § 2412.

**FIFTH CLAIM FOR RELIEF**
**Violation of the ESA by FWS**
**(Arbitrary Conclusion the Project Will Not Jeopardize the Continued Existence of the Mouse or Result in Destruction or Adverse Modification of its Critical Habitat)**

105.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 84 of this Complaint herein by reference.

106.     Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), requires FWS to insure that the Project is not likely to "jeopardize the continued existence" of the Mouse or "result in the destruction or adverse modification" of its designated critical habitat.

107.     FWS violated the ESA by concluding that the Project would not jeopardize the continued existence of the Mouse or destroy or adversely modify its designated critical habitat.  FWS inappropriately minimized the importance of the destruction of 26.1 acres of

the Mouse's most important critical habitat, the Project's potential to impede essential

connections between Mouse critical habitat units and between primary, secondary, and scrub

dunes in the Gulf Beach Critical Habitat Unit, the Project's potential to result in cumulative

impacts in the Gulf Beach Critical Habitat Unit, the Project's potential to impact other

public land critical habitat units via increased visitation, and the Project's potential to

increase the number of domestic and feral cats and other predators in the Mouse's habitat.

108.     Accordingly, for the reasons stated above, FWS's failure to insure the Project

will not jeopardize the continued existence of the Mouse or destroy or adversely modify the

Mouse's designated critical habitat is in violation of the ESA, 16 U.S.C. § 1536(a)(2). FWS's

action is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with

the ESA or the procedures required by law in violation of APA Sections 706(2)(A) & (D). 5

U.S.C. §§ 706(2)(A), (D). Plaintiff is entitled to recover costs, disbursements and attorney's

fees under the ESA, 16 U.S.C. § 1540(g) and/or the EAJA, 28 U.S.C. § 2412.

**SIXTH CLAIM FOR RELIEF**
**Violation of the ESA by FWS**
**(Arbitrary Failure to Use Best Available Science)**

109.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through

84 of this Complaint herein by reference.

110.     FWS has also violated ESA Section 7(a)(2) by failing to use the best available

science during its consultation on the Project. 16 U.S.C. § 1536(a)(2).

111.     FWS's failure to use the best available science represents agency action that is

arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA

or the procedures required by law in violation of APA Sections 706(2)(A) & (D). 5 U.S.C. §§

706(2)(A), (D). Plaintiff is entitled to recover costs, disbursements and attorney's fees under

the ESA, 16 U.S.C. § 1540(g) and/or the EAJA, 28 U.S.C. § 2412.

## SEVENTH CLAIM FOR RELIEF
### Violation of the ESA by FWS
### (Arbitrary Issuance of Incidental Take Statement)

112.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 84 of this Complaint herein by reference.

113.    The ESA prohibits "take" of species listed as endangered. 16 U.S.C. § 1538. FWS lists the Mouse as an endangered species.

115.    In its biological opinion, FWS determined that the Project would take individual Mice.

117.    FWS's ITS for the Project fails to clearly articulate the amount or extent of the anticipated incidental taking or the impact of this level of take on the species at either the local or range wide level. FWS's ITS also fails to specify reasonable and prudent measures necessary or appropriate to minimize the anticipated take because it does not know the actual number of Mice to be taken and fails to set forth terms and conditions to enforce any reasonable and prudent measures such as how deed restrictions on owning cats will actually be enforced to prevent ownership of cats or reduce the number of feral cats.

118.    Accordingly, FWS's ITS issued to the Corps allowing it to take all Mice on the Project site, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and its implementing regulations in violation of the APA. 5 U.S.C. §§ 706(A), (D). Plaintiff is entitled to recover costs, disbursements and attorney's fees pursuant to the ESA, 16 U.S.C. § 1540(g), and/or the EAJA, 28 U.S.C. § 2412.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Defenders of Wildlife, respectfully requests the Court to grant the following relief:

A.    Declare that the Corps violated NEPA and its implementing regulations

within the meaning of the APA in approving the Project;

B.      Declare that FWS violated Section 7 of the ESA and its implementing

regulations within the meaning of the APA in issuing its Biological Opinion

on the Project;

C.      Declare that FWS violated the ESA and its implementing regulations within

the meaning of the APA in issuing its Incidental Take Statement for the

Project;

D.      Vacate the Corps' Environmental Assessment and Clean Water Act Section

404 permit approving the Project and remand the matter to the Agency for

further consideration;

E.      Vacate the FWS's Biological Opinion approving the Project and remand the

matter to the Agency for further consideration:

F.      Award Plaintiff its costs of litigation, including reasonable attorney's fees,

pursuant to the EAJA, 28 U.S.C. § 2412; and

G.      Grant such additional relief as the Court may deem just and proper.


Respectfully submitted this 31st day of January, 2014


/S/ Michael Senatore
Michael Paul Senatore (D.C. Bar # 45116)
Defenders of Wildlife
1130 17th Street N.W.
Washington, D.C. 20036-4604
(202) 772-3221
msenatore@defenders.org

/S/ James Jay Tutchton
James Jay Tutchton (CO Bar # 21138)
Defenders of Wildlife
6439 E. Maplewood Ave.

Centennial, CO 80111
(720) 301-3843
jtutchton@defenders.org

*Attorneys for Plaintiffs*